IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON

DAVID L. RHODES,

      Plaintiff,

v.                                    CASE NO. 3:09-cv-00810

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, David L. Rhodes (hereinafter referred to as "Claimant"), filed an application for SSI on October 13, 2004, alleging disability as of July 15, 2004, due to back problems, high blood pressure, being a "slow learner" and depression. (Tr. at 52-56, 60, 90.)  The claim was denied initially and upon reconsideration. (Tr. at 35-37, 40-42.)  On January 13, 2006, Claimant requested a hearing before an Administrative Law Judge

("ALJ").  (Tr. at 29.)  The hearing was held on March 1, 2007, before the Honorable James D. Kemper.  (Tr. at 409-55.)  By decision dated July 9, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 15-21.)  On May 15, 2009, the Appeals Council considered additional evidence offered by the Claimant, but determined it did not provide a basis for changing the ALJ's decision.  (Tr. at 6-9.)  On July 15, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2007).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers

2

from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2007).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at

17.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of obesity, mild to moderate chronic obstructive pulmonary disease, and degenerative disc disease of the lumbar spine.  (Tr. at 17.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 17.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 18.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 19.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as small parts assembly, hand packing, non-emergency dispatcher and price marker, which exist in significant numbers in the national economy.  (Tr. at 20.)  On this basis, benefits were denied.  (Tr. at 21.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).
Additionally, the Commissioner, not the court, is charged with
resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d
1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not
abdicate their traditional functions; they cannot escape their duty
to scrutinize the record as a whole to determine whether the
conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d
396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the
Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was thirty-five years old at the time of the
administrative hearing.  (Tr. at 412.)  Claimant completed the
tenth grade and testified that he has tried several times to obtain
his GED, but has been unsuccessful.  (Tr. at 412, 416.)  In the
past, he worked as a timber cutter and deck hand.  (Tr. at 449.)

The Medical Record

The court has reviewed all evidence of record, including the
medical evidence of record, and will summarize it briefly below.

Evidence before the ALJ

Prior to his alleged onset date (July 15, 2004), Claimant
reported to the emergency room on March 19, 2002, complaining of
low back pain following an injury on the job in 2000.  Claimant had
begun a new job in the last week and was having back pain.  (Tr. at

179.)

On August 26, 2002, Claimant was taken to the emergency room by a sheriff's deputy who had a detention order for evaluation for possible commitment due to depression.  In the past month, Claimant reported extreme depression and had visualized killing himself and his family.  (Tr. at 173-76.)  Philip G. Veres, D.O. diagnosed depression with homicidal and suicidal ideation.  (Tr. at 176.)

On June 4, 2004, Claimant was involved in an all terrain vehicle accident.  Claimant was not wearing a helmet and was positive for alcohol.  He had an abrasion and knot on the left side of his forehead and received staples.  (Tr. at 167-68.) On June 7, 2004, Claimant reported to the emergency room for a possible infection with incomplete pain control.  Craig Ausmus, M.D. prescribed an antibiotic and Lortab.  (Tr. at 157-58.)  Claimant's staples were removed on June 10, 2004.  (Tr. at 151.)

On June 30, 2004, Claimant reported to the emergency room with a laceration to his left knee sustained while he was cutting firewood with a chainsaw.  Claimant received stitches.  (Tr. at 148.)

On July 2, 2004, Claimant reported to the emergency room for a recheck of his knee injury.  It was healing with no signs of infection.  (Tr. at 143-44.)

After Claimant's alleged onset date, Robert M. Holley, M.D. examined Claimant on November 22, 2004, at the request of the State

6

disability determination service. Dr. Holley diagnosed hypertensive cardiovascular disease, uncontrolled, depression and a possible learning disorder. Claimant also had mechanical low back pain or osteoarthritis of the lumbar spine with mild gait impairment. (Tr. at 100.)

On December 7, 2004, Catherine Van Verth Sayre, M.A. examined Claimant at the request of the State disability determination service. Claimant denied any mental health treatment, and reported a history of drug abuse. (Tr. at 104.) On the WAIS-III, Claimant had a verbal IQ score of 84, a performance IQ score of 78 and a full scale IQ score of 79. The scores were valid. On the WRAT-III, Claimant was reading and spelling on a fourth grade level and doing arithmetic on a seventh grade level. Ms. Sayre diagnosed disorder of written expression and cocaine dependence in full remission on Axis I and borderline intellectual functioning and antisocial personality characteristics on Axis II. (Tr. at 105-06.)

On December 17, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work, with an occasional ability to climb, balance, stoop and kneel, an inability to crouch and crawl, and a need to avoid concentrated exposure to extreme cold and heat and hazards. (Tr. at 107-14.)

On January 14, 2005, Claimant reported to the emergency room

with complaints of an acute exacerbation of lower back pain and was diagnosed with acute exacerbation musculoskeletal lower back pain. James Toothman, D.O. recommended heat treatment and prescribed Lortab and Flexeril.  (Tr. at 139.)

On February 5, 2005, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's mental impairments were not severe.  This finding was affirmed by a second State agency source on November 19, 2005.  (Tr. at 222-35.)

On February 11, 2005, Rida Mazagri, M.D. conducted a consultative neurological examination.  Dr. Mazagri reviewed Claimant's MRI on October 20, 2004, which showed multilevel degenerative disc disease, worse at L/4-5 with disc desiccation. There was an annular tear at the right side of L/4-5 level and a mild disc bulge at the L/4-5 level.  Dr. Mazagri opined that Claimant's back and right leg pain was "most probably mechanical due to degenerative disc disease as seen on the MRI especially L4/5."  (Tr. at 116.)  Dr. Mazagri recommended weight loss and physiotherapy, and possibly a pain management clinic consultation. (Tr. at 116.)

The record includes treatment notes from Pleasant Valley Rehabilitation Center dated February 22, 2005, through April 13, 2005.  Claimant was seen for five visits, had two no shows and two cancellations.  As a result, physical therapy was terminated.  (Tr.

8

at 119.)

On April 20, 2005, Claimant reported to the emergency room with complaints of lower back pain radiating down his left leg. Dr. Ausmus diagnosed acute exacerbation of chronic lower back pain with left lower extremity radiculopathy and hypertension.  (Tr. at 133.)  He encouraged Claimant to follow up with his physician, who may want to adjust his pain and blood pressure medications.  (Tr. at 134.)

On May 24, 2005, Robert Lewis, M.D. examined Claimant following his ATV accident.  Claimant reported a workplace injury in 2002, and an ATV accident when he was traveling 75 miles per hour, hit something and landed on a stump.  Claimant had a very antalgic gait on the right side.  Dr. Lewis did not detect any focal weakness, although some areas were limited secondary to pain. Claimant's reflexes were two plus and symmetric with downgoing toes.  Dr. Lewis reviewed Claimant's 2002 MRI and did not find any evidence of neural foraminal narrowing, but noted that there were some degenerative changes, which were maximal at the L4-L5 level. Dr. Lewis's assessment was low back pain, right leg pain, and status post ATV accident.  He prescribed Neurontin and ordered an EMG of the lower extremities.  (Tr. at 212-13.)

An EMG on June 13, 2005, was normal.  There was no evidence of a right lumbosacral radiculopathy.  There was slightly reduced left sural sensory nerve action potential amplitude of uncertain

significance.  (Tr. at 209-10.)

On June 30, 2005, Claimant reported to the emergency room complaining of lower back pain radiating up his back with muscle spasms in his neck after carrying concrete blocks to level his trailer.  Dr. Ausmus diagnosed acute exacerbation of chronic lower back pain secondary to muscle spasms.  (Tr. at 127.)  He prescribed Lortab, Soma and Neurontin.  (Tr. at 128.)

On September 9, 2005, Dr. Lewis saw Claimant again, this time for a soft tissue mass in the right medial aspect of his leg.  Dr. Lewis saw no evidence of radiculopathy and the antalgia in Claimant's gait had improved.  He diagnosed low back and right leg pain.  Dr. Lewis noted that Claimant had "a lot of arthritic and degenerative changes in his low back.  I feel his pain is musculoskeletal and probably osteogenic in nature." (Tr. at 207.) Dr. Lewis also diagnosed right leg soft tissue swelling, which appeared to be in a focal distribution.  He did not see any swelling in his lower extremity.  (Tr. at 207.)  He recommended a venous doppler.  (Tr. at 208.)

On November 11, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work, with occasional postural limitations and a need to avoid concentrated exposure to extreme cold, vibration, and fumes, odors dusts, gases and poor ventilation.  (Tr. at 214-21.)

10

The record includes treatment notes from Breton Morgan, M.D. dated September 16, 2000, through January 27, 2006. (Tr. at 240-85.) An MRI on October 24, 2000, was unremarkable, but limited due to patient movement. (Tr. at 279.) An MRI on October 20, 2004, showed early degenerative disc disease at the L4/L5 and L5/S1 levels. Claimant had an annular tear in the foraminal region on the right at the L4/L5 level. A minute annular tear was present in the left paracentral region at the L5/S1 level. Contour abnormality suggested mild disc protrusion in the foraminal region and centrally at the L4/L5 level. (Tr. at 268.)

An MRI of the lumbar spine on December 15, 2005, showed very minimal disc bulging. There was no obvious evidence of disc protrusion or extrusion. Neural foramina appeared patent. Examination of the L4/L5 level showed broad-based disc protrusion on the right, causing some encroachment on the neural foramina. A previously reported annular tear in this area was not apparent. Examination of the L5/S1 showed no annular tear. There was regression of the central disc protrusion seen on the prior study. Claimant had mild disc bulging present at this level. Neural foramina appeared patent. Interarticular facets appeared intact. (Tr. at 247.)

On January 27, 2006, Dr. Morgan completed a Residual Functional Capacity Assessment. He opined that Claimant could lift or carry less than five pounds, that he must alternate sitting and

standing every fifteen to thirty minutes, that Claimant cannot push or pull and that Claimant is capable of less than a full range of sedentary work. He further opined that Claimant could occasionally balance, grasp, drive and engage in fine manipulation, but that he should never climb, stoop, kneel, crouch or crawl. Dr. Morgan further stated that Claimant should avoid temperature extremes and stress. (Tr. at 240-44.)

The record includes treatment notes and other evidence from Robert W. McCleary, D.O. dated November 18, 2005, through January 24, 2006. On November 18, 2005, Claimant reported to Dr. McCleary with complaints of right calf pain and low back pain. Claimant as neurovascularly intact. Claimant had a mass over the medial aspect of the calf. Ultrasound was negative. Claimant had low back pain with chronic right leg pain, but "DTRs are normal. No clonus or Babinski. Positive rectal tone. No bowel or bladder dysfunction." (Tr. at 298.) Dr. McCleary recommended an MRI and prescribed Naprosyn. (Tr. at 298.) On January 14, 2006, Claimant presented with low back pain with a past history of falling off a barge. Claimant was neurovascularly intact. He had pain and spasms with tenderness over the L4/L5 dermatomal region. He had 4/5 strength in the hamstrings on the right, 5/5 on the left and 4/5 quad strength. "DTRs are within normal limits. He has no clonus or Babinski. He has positive straight raise on the right." (Tr. at 294.) Dr. McCleary noted that x-ray examination showed no evidence

12

of a pars defect of a spondylolisthesis, but that an MRI showed degenerative disc disease at L4/L5 most prominent, with less at L5/L1 with foraminal narrowing at the right at L4/L5. There was no central cord stenosis. Dr. McCleary diagnosed degenerative disc disease L4/L5 and L5/S1 with right leg radiculopathy. He recommended treatment at a pain clinic, including Accu-Spina treatments, and continuation of his pain mediation. (Tr. at 294.)

On March 3, 2006, Dr. McCleary noted that Claimant was "doing rather well." (Tr. at 295.) He was neurovascularly intact. Dr. McCleary recommended that Claimant continue Accu-Spina treatments. (Tr. at 295.) On April 12, 2006, Claimant reported little benefit from pain management. Dr. McCleary noted that he was "awaiting Accu-Spina treatments on [Claimant]. At this point he still complains of low back pain. He cannot work." (Tr. at 296.) Dr. McCleary recommended physical therapy. (Tr. at 296.) On June 9, 2006, Claimant saw Dr. McCleary for degenerative disc disease at L4/L5 and L5/S1. Claimant had pain management injections with little relief. Claimant had facet hypertrophy with foraminal stenosis at L4/L5. Dr. McCleary recommended Lortab, Soma and Flexeril. (Tr. at 297.)

On September 25, 2006, Larry T. Todd, Jr., D.O. conducted a consultative examination of Claimant. Based on examination and the MRI dated December 15, 2005, Dr. Todd diagnosed mild degenerative disc changes, L4-5 and L5-S1. Dr. Todd stated that he "did not see

any need for any surgical intervention." (Tr. at 300.) Dr. Todd recommended that Claimant see a pain specialist. (Tr. at 300.)

The record includes treatment notes and other evidence from Anil J. Patel, M.D. of the Pain Management Center dated February 2, 2006, through April 28, 2006. Claimant underwent a number of treatments, with some relief. (Tr. at 304-26.)

The record includes treatment notes and other evidence from Robert M. Holley, M.D. dated October 9, 2006, through February 27, 2007. (Tr. at 328-49.) On November 27, 2006, Dr. Holley wrote that Claimant "has degenerative disc disease of the lumbar spine with right lumbar radiculopathy; dysmetabolic syndrome; hypertensive cardiovascular disease; hyperlipidemia and depression/anxiety." (Tr. at 344.) He opined that "[d]ue to his limited level of function and increased level of pain associated with degenerative disc disease of his lumbar spine, this patient is unable to perform any ruminative [sic; remunerative] employment at this time." (Tr. at 344.)

On February 27, 2007, Dr. Holley completed a Residual Functional Capacity Assessment on which he opined that Claimant could lift no additional weight, stand and/or walk two hours in a regular workday and sit less than two hours in a regular work day, that Claimant could occasionally climb, stoop, kneel, crouch and drive a car, but that Claimant could never crawl. He opined that Claimant could not relate to co-workers and supervisors, handle

14

stress or tasks requiring the ability to concentrate and remember
or relate to the public.   Dr. Holley's diagnoses included
degenerative disc disease, depression and anxiety, and he opined
that Claimant could not work.  (Tr. at 345-49.)

Evidence submitted to the Appeals Council

Claimant submitted additional treatment notes and other
evidence from Dr. Holley dated December 7, 2006, January 18, 2007,
February 27, 2007, March 5, 2007, April 5, 2007, and May 17, 2007.
(Tr. at 355-69.)

On May 23, 2006, Claimant reported to the emergency room with
low back pain after missing a pain clinic appointment.  Claimant
stated that he just needed a work excuse.  Claimant was diagnosed
with acute exacerbation of chronic low back pain and degenerative
disc disease.  He was instructed to follow up with the pain clinic
and was given a one day work excuse.  (Tr. at 397.)

On November 10, 2006, Claimant reported to the emergency room
with left ankle pain following an altercation.  Claimant was
diagnosed with a left ankle sprain, and an abrasion to his finger
and fitted with an air splint and given crutches.  (Tr. at 388-89.)
X-rays were normal.  (Tr. at 391.)

On December 13, 2006, Rachel Arthur, M.A. completed a
consultative mental examination.  Claimant reported a history of
drug abuse and incarceration for four years.  Claimant was able to
perform self care tasks and reported arising at 7:00 a.m. and going

15

to bed at 11:00 p.m.  Claimant reported that he spent his day
caring for his daughter.  He shopped for himself and handled his
own finances.  Claimant reported he does not drive and engaged in
no hobbies.  Claimant reported weekly contact with friends in
person and by phone.  (Tr. at 405.)  Claimant's mood was somewhat
depressed, and his affect was restricted.  Claimant's insight was
fair, while his judgment was moderately deficient.  Claimant had no
suicidal ideations.  His immediate memory and remote memory were
within normal limits.  (Tr. at 405.)  Claimant's concentration was
mildly deficient.   Claimant exhibited various pain behaviors
during the evaluation.  Claimant's social functioning was mildly
deficient.  Ms. Arthur diagnosed depressive disorder, not otherwise
specified on Axis I and made no Axis II diagnosis.  (Tr. at 406.)
On the Beck Depression Inventory-Second Edition, Claimant's score
of 36 fell in the severe range of depressive symptoms.  (Tr. at
407.)

     Ms. Arthur completed a summary on which she noted Claimant's
diagnosis and also stated that Claimant's history suggests he may
have a personality disorder.  Ms. Arthur opined that Claimant would
be disabled for more than a year.  She noted that Claimant did not
"report that depression interferes with his ability to obtain or
maintain employment."  (Tr. at 408.)

     On March 23, 2007, Claimant reported to the emergency room
with complaints of low back pain and leg numbness after lifting an

engine.  Claimant was diagnosed with back strain and chronic back pain.  (Tr. at 385.)

Claimant reported to the emergency room on August 3, 2007, with complaints of a headache, knots on his head and arm pain after he was assaulted by two individuals the night before.  (Tr. at 374.)  A CT scan of the head was normal.  (Tr. at 379.)  X-rays of Claimant's right arm were negative.  (Tr. at 381.)

On January 11, 2008, Dr. Holley completed a West Virginia Department of Health and Human Resources Medical Review Team, General Physical (Adults) and opined that Claimant was unable to work.  (Tr. at 401-03.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred in failing to find that Claimant had a severe mental impairment where the undisputed evidence shows that Claimant has borderline intelligence; (2) the ALJ erred in determining Claimant's physical residual functional capacity; and (3) the ALJ erred in rejecting the opinions of Claimant's treating physicians.  (Pl.'s Br. at 9-14.)

The Commissioner argues that (1) Claimant does not meet or equal Listing 12.05; (2) the ALJ accounted for Claimant's borderline intellectual functioning and disorder of written expression in his residual functional capacity assessment by

limiting Claimant to unskilled work; and (3) the ALJ properly gave little weight to the disability determinations of Drs. Morgan and Holley.  (Def.'s Br. at 9-17.)

Claimant first asserts that the ALJ erred in failing to find that he had the severe mental impairment of borderline intellectual functioning.  Claimant refers to the opinion of the State agency source who found that Claimant had no severe mental impairment. Claimant asserts that the State agency medical source's opinion in

> Exhibit 9F indicates that Mr. Rhodes had an organic mental disorder and a substance addiction disorder.  The organic mental disorder was stated to be Borderline Intellectual functioning and a learning disability (LD). Organic mental disorder appears to require a loss of IQ, e.g., "loss of measured intellectual ability of at least 15 IQ points from premorbid levels ...."  In other words the claimant would have to have been functioning in the past at a higher intellectual level for this section to apply.

(Pl.'s Br. at 9-10.)  Claimant further asserts that Claimant's IQ scores in the high 70s and low 80s were found to be valid based on his work history, academic history and his effort, "rather than a new finding based on an organic brain injury.  Borderline IQ of this nature should fall under 12.05....  While the major attention is generally paid to those individuals whose IQ falls below 70, those individuals with Borderline IQ are also to be considered severely impaired."  (Pl.'s Br. at 10) (footnote omitted). Claimant contends that the ALJ did not consider his diagnosed learning disability or his lack of intellectual functioning. (Pl.'s Br. at 11.)

18

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. § 416.920a (2007). First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. § 416.920a(b)(1). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). § 416.920a(b)(1) and (e). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). § 416.920a(b)(2). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). § 416.920a(c)(3). The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. § 416.920a(c)(4). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. § 416.920a(d)(1). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. § 416.920a(d)(2). Fifth, if a mental impairment is "severe" but

19

does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity.  § 416.920a(d)(3).  The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

§ 416.920a(e)(2).

In his decision, the ALJ determined that Claimant did not have a severe mental impairment.  The ALJ acknowledged that Claimant testified that he suffered from depression.  The ALJ explained that

> the State agency psychological consultant concluded that the evidence of record did not support the presence of a mental disorder which would interfere in any significant way with claimant's ability to function in social and occupational settings (Exhibit 9F).  In light of the absence of any regular, ongoing treatment by a mental health care professional, the [ALJ] accepts this assessment.  The only evidence of any mental disorder is claimant's history of alcohol and drug abuse and numerous arrests (Exhibits 2F, 6F).  Claimant testified at the hearing that he drinks only occasionally.  Absent a substance abuse disorder, partially in remission, claimant has no other severe mental impairments.  Absent the use of alcohol or drugs, claimant's reports of depression have caused only mild deficiencies in his activities of daily living, social functioning, and concentration, persistence and pace.  There is no evidence that he has ever experienced episodes of decompensation in a work or work-like setting.

(Tr. at 17.)

While the ALJ does not explicitly analyze Claimant's diagnosis

20

of borderline intellectual functioning, the court proposes that the presiding District Judge find this to be harmless error.[1] Furthermore, contrary to Claimant's assertions, he was not diagnosed with a learning disorder, only a disorder of written expression. (Tr. at 106.) While Dr. Holley diagnosed a "possible learning disorder" (Tr. at 100) during a consultative physical examination, this was not a diagnosis mentioned by him when he began to treat Claimant or when he completed subsequent evaluations (including one submitted to the Appeals Council). In addition, Claimant incorrectly states in his brief that State agency sources opined that Claimant had a learning disability. (Pl.'s Br. at 9.) In fact, they state that claimant had "BIF r/o LD," or borderline intellectual functioning rule-out learning disability. (Tr. at 223.)

Ms. Sayre diagnosed a disorder of written expression and

---

[1] Courts have applied a harmless-error analysis in the context of Social Security appeals. One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by Morris will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. See, e.g., Bishop v. Barnhart, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); Camp v. Massanari, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); Spencer v. Chater, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

borderline intellectual functioning based on Claimant's IQ scores in the high 70s and low 80s, and the State agency medical experts opined that Claimant's mental impairments of polysubstance abuse and "borderline intellectual functioning rule out learning disability" were not severe impairments because they resulted in only mild limitations in three of the four areas of functioning, with insufficient evidence in the final area, episodes of decompensation of extended duration.  (Tr. at 223, 232.)

In making the finding that Claimant had no severe mental impairments, the ALJ relied on the opinions of the State agency sources, as well as Claimant's lack of mental health treatment and his daily activities.  (Tr. at 17.)  The State agency medical sources considered Claimant's level of intellectual functioning and concluded that it did not have an impact on Claimant's abilities in the four areas of functioning.  In short, the ALJ's ultimate determination that Claimant did not have a severe mental impairment is supported by substantial evidence.  Even considering the additional evidence submitted to the Appeals Council, such evidence does not direct a different conclusion. Wilkins v. Secretary, 953 F.2d 93, 96 (4th Cir. 1991) (Where the Appeals Council specifically incorporates new evidence into the administrative record, the court must review the record as a whole, including the new evidence submitted to the Appeals Council, in order to determine whether the ALJ's decision is supported by substantial evidence.).  Indeed, the

new evidence submitted to the Appeals Council from Ms. Arthur does not even mention a diagnosis of borderline intellectual functioning.  (Tr. at 406-08.)

While Claimant may have borderline intellectual functioning, his IQ scores are well outside the range of consideration for Listing 12.05.[2]  Claimant's suggestion that borderline IQ scores of this nature "should fall under 12.05" is unconvincing.  (Pl.'s Br. at 10.)

Likewise, Claimant's reliance on Reichenbach v. Heckler, 808 F.2d 309, 311 (4th Cir. 1985), is misplaced.  In Reichenbach, the court found that the ALJ failed to consider the combined effect of the claimant's various impairments, including Reiter's disease and slight intellectual deterioration (the claimant had an IQ of 75). That is simply not the case in the instant matter.  Besides, the jobs ultimately adopted by the ALJ, including small parts assembly, hand packing, non-emergency dispatcher and price marker, were unskilled.  (Tr. at 20.)

Next, Claimant argues that the ALJ erred in assessing

_____

[2]   In order to meet the criteria of Listing 12.05C, the regulations require that Claimant must meet the introductory language of Listing 12.05C, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2007); see also § 12.00A (stating that for Listing 12.05, claimants must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria).  Listing 12.05C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2007).

Claimant's physical residual functional capacity.  Claimant
complains that the ALJ improperly relied on the injuries Claimant
sustained involving a chain saw and an ATV, when these incidents
occurred in June of 2004, before Claimant alleged he became
disabled on July 15, 2004.  (Pl.'s Br. at 11.)   In addition,
Claimant asserts that the ALJ erred in relying on the fact that
Claimant reported to the emergency room after lifting concrete
blocks, occasionally mowed his lawn with a riding lawn mower and
was involved in an assault and battery.  Claimant asserts that
"[t]he fact that Mr. Rhodes ended up in the Emergency Room after
lifting concrete blocks should be considered as evidence that he
cannot engage in work like this on a sustained basis." (Pl.'s Br.
at 12.)  In a related vein, Claimant argues that the ALJ erred in
rejecting the opinions of Claimant's treating physicians, Dr.
Morgan and Dr. Holley.  (Pl.'s Br. at 11-14.)

      In his decision, the ALJ, in assessing Claimant's subjective
complaints of pain and explaining the weight afforded the opinions
of Drs. Morgan and Holley and others, stated that

> the [ALJ] is fully crediting the limitations noted by the
> State agency medical consultant.  Although Drs. Robert
> Holley and Breton Morgan are of the opinion that claimant
> would be unable to perform even the full range of
> sedentary work on a sustained and competitive basis ...,
> these opinions appear to be based in large part on
> claimant's subjective complaints inasmuch as the mild
> findings on clinical examination do not support such
> extreme functional limitations.  In addition, the [ALJ]
> finds these opinions to be inconsistent with claimant's
> reported activities of daily living and the partial
> relief he gets from his pain medications.  These factors

> suggest claimant could perform a broader range of
> functioning than these two physicians have indicated.
> The record shows that the claimant engages in various
> activities from time to time which suggest that he is
> capable of meeting the physical demands of light work.
> In June 2004, he was treated for injuries which resulted
> from driving an all terrain vehicle in a reckless manner.
> He was also treated for a left knee laceration resulting
> from an accident involving the operation of a chainsaw.
> In June 2005, he was treated for an exacerbation of lower
> back pain after lifting and carrying heavy blocks of
> concrete (Exhibit 6F).  At the hearing on this matter,
> the claimant testified that his cousin helped him put a
> motor in his truck.   He also admitted that he
> occasionally cuts his grass with a riding lawnmower and
> was involved in an assault and battery of an individual
> 3-4 months before the hearing.  These activities hardly
> reflect an individual as limited as Drs. Holley and
> Morgan have reported.

(Tr. at 19.)

The court proposes that the presiding District Judge find that the ALJ's pain and credibility findings are consistent with the applicable regulations, case law and social security ruling ("SSR") and are supported by substantial evidence.  20 C.F.R. § 416.929(b) (2007); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain, precipitating and aggravating factors and Claimant's medication. (Tr. at 18.)  The ALJ did not err in relying on medical evidence dated in the preceding months and even days before he alleged disability.  Moreover, his conclusions about Claimant's credibility on the basis of these and other findings are supported by

substantial evidence, and the court proposes that the presiding District Judge so find.

The court further proposes that the presiding District Judge find that the ALJ properly weighed the evidence of record from Drs. Holley and Morgan in keeping with the applicable regulations and caselaw. Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996) (A treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."); 20 C.F.R. § 416.927(d)(2)-(6) (2007) (If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the following factors: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.).

In addition to the factors relied upon above in assessing Claimant's subjective complaints, the ALJ also explained in his decision that Claimant had been tried on various conservative modalities for his lower back and right lower extremity pain, that diagnostic evidence including an MRI showed degenerative disc disease and an annular tear in the foraminal region on the right at the L4-5 level as well as a minute annular tear in the left

paracentral region at the L5-S1 level, but no nerve root compression or spinal stenosis. In addition, a subsequent MRI in 2005 showed no more evidence of such annular tears, and the assessment at that time was disc bulging at the lowest three lumbar disc levels. There was some encroachment on the neural foramina at the L4-5 level. The impression at this time was normal right lower leg. In addition, the ALJ noted that an earlier EMG/NCS study done in June 2005 was interpreted as being within normal limits and without evidence of radiculopathy. (Tr. at 18-19.) Finally, the ALJ noted that Claimant's "physical examinations show restricted range of motion of the lumbar spine but are otherwise fairly unremarkable. The claimant has 5/5 motor strength in both his upper and lower extremities and is neurologically intact. Straight leg raising tests are also reported to be negative." (Tr. at 19.)

The ALJ's findings are supported by substantial evidence and in keeping with the applicable regulations and caselaw cited above. The findings of total disability by both physicians were not supported by the objective evidence of record, and the ALJ was justified in relying upon the opinion of the State agency medical sources. Clearly, Claimant's impairments result in significant limitation, as Claimant was just thirty-five years old and found to be capable of only light work, with further limitations, but the substantial evidence of record, including that submitted to the Appeals Council, does not support a finding that Claimant was

disabled from all work.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.

1984).   Copies   of   such   objections   shall   be   served   on   opposing
parties,   Judge   Chambers,   and   this   Magistrate   Judge.

The   Clerk   is   directed   to   file   this   Proposed   Findings   and
Recommendation   and   to   transmit   a   copy   of   the   same   to   counsel   of
record.


_August 6, 2010_
        Date

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge